Case No. 19 MJ 783 JTH

| | | |
|---|---|---|
| STATE OF MINNESOTA | ) | |
| | ) ss. | AFFIDAVIT OF MARIANO I. ARGUEDAS |
| COUNTY OF BELTRAMI | ) | <u>FILED UNDER SEAL</u> <u>PURSUANT TO ORDER</u> |

## AFFIDAVIT IN SUPPORT OF
## A COMPLAINT AND ARREST WARRANT

Your affiant, Mariano I. Arguedas, being duly sworn, does depose and state as follows:

### INTRODUCTION

1. I am a Border Patrol Agent with the United States Border Patrol ("USBP") and have been so employed since January of 2004. Since June 2016, I have been assigned to the Federal Bureau of Investigation ("FBI") Headwaters Safe Trails Task Force ("HSTTF"), which has responsibilities for investigating the manufacture, sale, distribution, and illegal use of controlled substances; crimes of violence; sexual assaults; violent gangs; illegal trafficking and use of firearms and explosives; money laundering; and the apprehension of dangerous fugitives on the Red Lake Indian Reservation ("the Reservation") and other Indian reservations in northern Minnesota.

2. As a member of the FBI's HSTTF, I have authority to investigate crimes occurring within Indian Country. I also have the authority to seek and execute federal process to include arrest and search warrants.

3. Currently, I am investigating a crime of domestic violence involving an assault resulting in serious bodily injury; specifically, extensive bruising and a persistent vegetative state. This investigation is a joint investigation between FBI's HSTTF and the Red Lake Police Department ("RLPD"). The facts set forth in this affidavit are based on

SCANNED
NOV 2 2 2019
U.S. DISTRICT COURT ST. PAUL

my personal knowledge and observations in this investigation, on the knowledge and observations of other law enforcement officers involved in the investigation, and on my review of official reports submitted in relation to this investigation. This affidavit does not contain all facts known to me regarding this matter, but only those sufficient to support a finding of probable cause for the arrest warrant.

## PURPOSE OF THE AFFIDAVIT

4. This affidavit is made in support of a Criminal Complaint and Arrest Warrant for WILLIAM JONES IV ("JONES"), date of birth 05/12/1997, an enrolled member of the Red Lake Band of Chippewa, for Assault Resulting in Substantial Bodily Injury in violation of Title 18, United States Code, Sections 113(a)(7), 1151, and 1153.

## PROBABLE CAUSE

5. On or about November 8, 2019, at or before midnight, an ambulance arrived at Big Obaashing Loop in Ponemah, Minnesota, on the Red Lake Indian Reservation.

6. Law Enforcement separately interviewed two Red Lake Emergency Medical Services medics who attended the scene (hereinafter "Witness 1" and "Witness 2").

7. Witness 1 stated that he had been working at the Ponemah, Minnesota ambulance garage when a female called. The caller stated that an ambulance was needed at the house of Brittany Lynn ROY (hereinafter "ROY") because, "[s]he got drunk the other day and she hasn't woken up."

8. Witness 1 asked if ROY had gotten up to use the bathroom. The female caller responded, "I just got here."

9. Upon arrival at the residence described above, Witness 1 and Witness 2 encountered William JONES IV (hereinafter "JONES"), a registered Native American male, and his mother Melanie June JOHNSON (hereinafter "JOHNSON"). Witness 1 identified JOHNSON as the woman who had requested the ambulance. JOHNSON and JONES were standing in the living room, and directed Witness 1 and Witness 2 to a back bedroom.

10. Witness 1 and Witness 2 encountered Brittany Lynn ROY (hereinafter "ROY"), a registered Native American female born on XX/XX/1992, in the back bedroom. Witness 1 and Witness 2 observed ROY laying face-up on the edge of the bed. ROY was breathing rapidly. One of ROY's legs and arms were hanging off the edge of the bed. ROY was covered with bedding.

11. Upon removing the bedding, Witness 1 observed that ROY was wearing a pair of shorts and a grey shirt; however, ROY's shirt was mostly off and only covered one arm. Witness 1 observed that the shirt was wet, and that ROY had urinated on herself.

12. Witness 2 observed that the bed was wet with urine.

13. Witness 2 observed that the red shorts covered ROY's frontal pubic region, but not her buttocks, in a manner consistent with a person attempting to dress ROY while she was unconscious.

14. Witness 1 and Witness 2 conducted a very firm "sternum rub." Your Affiant knows that a sternum rub is conducted by firmly rubbing a knuckle against an unconscious patient's sternum in an effort to assess the patient's response to pain. Witness 1 stated

3

ROY blinked her eyes, but "she wasn't awake", and was grinding her teeth. ROY did not respond to verbal stimuli.

15. Witness 2 stated that the sternum rub had to be conducted very firmly before ROY would respond.

16. Witness 2 stated that upon watching ROY react to the sternum rub, JONES asked, "is that a bad sign?" or similar words to that effect. Aside from this, Witness 2 did not observe JONES to exhibit concern for ROY's medical condition.

17. Witness 1 and Witness 2 observed that ROY was "full of bruises," which cover most of her body. Witness 2 observed that some of ROY's bruises appeared to be old and some were new.

18. JONES told Witness 1, "she fell over the other night when she got drunk, I helped her to bed." He further explained to Witness 1 that ROY had fallen over backwards in the living room.

19. JONES told Witness 1 that he moved ROY from the living room to the bedroom and put her to bed, and that she has not woken up since.

20. Witness 1 stated that JONES told him that for two days JONES hadn't called the ambulance because he did not know the number. Witness 1 asked JONES, "What's wrong with 911?" JONES did not answer him.

21. Witness 1 stated that JONES did not provide any medically useful information besides ROY's name and birthdate, and he refused to answer further questions.

22. Witness 2 asked JONES questions in an effort to ascertain ROY's condition in order to medically treat ROY. JONES gave vague, noncommittal answers to Witness 2's

4

questions. JONES stated that ROY came home drunk at 3:00 AM "the other day", and fell down and hit her head in the bedroom.

23. JONES indicated that ROY had vomited on the floor. Witness 1 saw a small quantity of apparent vomit on the floor.

24. Witness 1 and Witness 2 transported ROY to the Red Lake Indian Health Service hospital (hereinafter "IHS").

25. Witness 2 discovered an injury to ROY's head during transport that they had missed at the house.

26. Witness 1 did not observer any further injuries to ROY. He did not observe any blood.

27. Witness 1 stated that he called RLPD to request a police escort to clear the road en route to IHS and for an officer to meet them there.

28. Given their interactions with JONES, Witness 1 and Witness 2 were concerned that ROY was the victim of domestic violence. Witness 1 and Witness 2 advised emergency room staff that JONES should not be allowed to visit ROY.

29. Law enforcement interviewed ROY's mother, Eunice WHITEFEATHER (hereinafter "WHITEFEATHER"). Upon learning that ROY had been hospitalized, WHITEFEATHER asked law enforcement if ROY was hospitalized because JONES had beaten her.

30. WHITEFEATHER explained that ROY and JONES had been involved in a romantic relationship for a little over one year, and that JONES would routinely abuse ROY, stating that ROY is frequently bruised.

31. WHITEFEATHER stated that ROY has two minor children (aged 9 and 10) with JOE Whitefeather. She explained that ROY and JONES have been awarded primary custody by Red Lake Family and Children's Services ("FCS"). The children were not present during the assault or subsequent events.

32. Law Enforcement interviewed a neighbor of ROY and JONES (hereinafter "Witness 3"). Witness 3 described living next door to ROY and JONES for about a year. Despite being neighbors, Witness 3 has not associated with either ROY or JONES, stating that that they only learned ROY's name after she was brought to the hospital.

33. Witness 3 stated that ROY and JONES frequently had drinking parties.

34. Witness 3 described watching ROY and JONES fight in the street in front of their house on a regular basis. Witness 3 estimated that this took place about once a week during the summer of 2019. Witness 3 further described watching ROY and JONES hit each other during these fights, but stated that they did not appear to be trying to hit each other very hard.

35. Witness 3 described one occasion in which JONES dragged ROY back to the house by her arm. On this occasion ROY was conscious.

36. On November 13, 2019, law enforcement conducted separate videotaped interviews of JONES and JOHNSON in the Alexandria, Minnesota police station. Neither was in custody at the time of the interview, and they left the police station after the interviews concluded.

37. JONES stated that he and ROY had been dating since Labor Day of 2018, and that they were friends for some time before that. He stated that he moved into ROY's home very early in the relationship because he did not have another place to stay.

38. JONES stated that he and ROY had been drinking and using methamphetamine for several days before ROY's injury. He stated that ROY was drinking more than he was. He further stated that they ran out of methamphetamine a day or two before ROY was injured, but they continued drinking. He stated that they were alone during this time.

39. JONES stated that at some point on November 6, 2019, he and ROY showered. During ROY's shower, JONES looked at her over the shower curtain. This angered ROY, and she hit him on the arm. They then began fighting and hitting each other. JONES stated that he hit ROY on the shoulders, arms, and torso, and that she hit him on the arms. At some point, JONES stated that he threw ROY against a wall.

40. JONES stated that the fight lasted less than ten minutes and ended with no clear winner or loser. He stated that he sat down at one end of the bed to watch a movie, and ROY laid down at the other end of the bed and began drinking vodka from a bottle. JONES stated that ROY was crying at this time.

41. JONES stated that at some point ROY stood up and walked to another part of the house. When she returned she was very drunk and unsteady on her feet. He described her as hanging on to the wall as she walked.

42. JONES stated that ROY fell down in the bedroom and hit her head. He stated that she either hit her head on the floor, a piece of board protruding from the box spring, or the edge of the bed.

43. JONES stated that ROY was "asleep" as a result of the fall, and that she was "zonked out."

44. JONES stated that while ROY was unconscious, he moved her from the floor to the bed. During this process he dropped her one or two times.

45. JONES stated that ROY urinated on herself, so he changed her out of her wet clothes.

46. JONES stated that he was not very concerned at first because, "...it happened once before, too, where she fell over and knocked herself out and then she woke up. It happened before."

47. JONES stated that he and ROY only fought every once in a while.

48. At the conclusion of the interview, JONES was served with a search warrant to photograph and search his body for evidence of any assault, including trace evidence of hair, blood, bruising, or body fluids.

49. JONES did not have any evidence of bruising during the execution of the body search warrant.

50. JOHNSON advised law enforcement that she had been in Red Lake on November 7, 2019. During her visit, JONES rode with her in her car. JOHNSON stated that ROY was still asleep after drinking the night before.

51. JOHNSON stated that multiple people called her on November 8, 2019, to tell her that JONES wanted her to call him.

52. JONES explained to law enforcement that she does not have a cell phone. He further explained that he and ROY share a landline phone, which does not allow for long

distance calling. As such, he asks other people to call JOHNSON, so that she can call him on the landline.

53. JONES stated that JOHNSON called him during the afternoon of November 8, 2019. JONES asked JOHNSON for help with ROY. JONES requested, "come get me, she hasn't woken up yet."

54. JOHNSON drove up from Alexandria, Minnesota and arrived between 9:00 and 10:00 p.m. JOHNSON observed that ROY was covered with a blanket.

55. JONES stated, "I should have called the ambulance when it happened," and "I didn't think it would be that bad. I thought she would wake up like she did before."

56. JONES has since left Red Lake and taken up residence with JOHNSON in Alexandria.

57. Law enforcement executed a search warrant of ROY's unsecured residence on November 12, 2019.

58. During this search warrant, law enforcement photographed a single empty alcohol bottle. Law enforcement also observed and photographed several holes in the walls, consistent with being caused by fists or thrown items.

59. Law enforcement also photographed a broken flat screen television and a cellular phone with a broken screen. The cellular phone was located on the floor below a hole in the drywall, which is consistent with a phone being thrown at the drywall.

60. Among other items, law enforcement collected various items of bedding, which appeared to have blood and/or urine.

61. Also, a search of the premises revealed that JONES had removed most, if not all, of his personal belongings, including clothing, from the residence.

62. ROY was medevaced and flown from I.H.S. to the Sanford Health Hospital (hereinafter "Sanford") in Fargo, North Dakota for advanced medical treatment.

63. Upon ROY's arrival to Sanford, medical personnel photographed ROY's numerous injuries, which are attached to this affidavit as exhibits.

64. ROY's care coordinator informed law enforcement that upon arrival, ROY had severe brain swelling that necessitated an emergency craniectomy. ROY's care coordinator explained that a craniectomy is a neurosurgical procedure in which part of the skull is removed to allow a swelling brain to expand without being squeezed by the confines of the skull. Generally, a craniectomy is performed on victims with traumatic brain injuries.

65. Due to ROY's condition, she was placed on a ventilator for breathing assistance and life-support.

66. Additionally, ROY's care coordinator informed law enforcement that there was a midline shift of ROY's brain, meaning the brain has shifted past its center line. The midline shift was also described as a left to right shift.

67. Additionally, ROY exhibited brain ischemia, a condition where there is insufficient blood flow to the brain, eventually causing partial brain death.

68. Due to ROY's partial brain death, ROY's care coordinator explained that ROY will need persistent, prolonged, and life-long care should ROY be able to survive without prolonged ventilation. However, ROY's care coordinator explained that ROY's prognosis was grim and that, upon removal from life-support, ROY would not likely survive.

69. ROY's care coordinator also informed law enforcement that ROY had a recent right rib fracture to her second rib.

70. On November 21, 2019, ROY's family disconnected her from life support at approximately 2:00 p.m.

71. The residence described above, located in Ponemah, Minnesota, is within the exterior boundaries of the Red Lake Indian Reservation.

72. Based on the information above, I believe there is probable cause to conclude that on November 6, 2019, in the State and District of Minnesota, and within the exterior boundaries of the Red Lake Indian Reservation, WILLIAM JONES IV, an Indian, did knowingly assault his intimate partner, and that as a result of that assault BRITTANY LYNN ROY suffered substantial bodily injury, all in violation of Title 18, United States Code, Sections, 113(a)(7), 1151, and 1153.

Further, your affiant sayeth not.

_____ 11/22/2019
Mariano I. Arguedas
Federal Bureau of Investigation

_____ 11-22-19
THE HONORABLE JON T. HUSEBY
UNITED STATES MAGISTRATE JUDGE