UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 19-cr-341 (NEB/LIB)

          Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

William Jones, IV,

          Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant William Jones' ("Defendant") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 41], as well as, his Motion to Suppress Statements, Admissions, and Answers. [Docket No. 42]. The Court held a Motions Hearing on October 20, 2020, regarding the parties' pretrial motions.[1]

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 41], and his Motion to Suppress Statements, Admissions, and Answers, [Docket No. 42], were taken under advisement.

For reasons discussed herein, the undersigned recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 41], be **DENIED**, and it is further recommended that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 42], be **DENIED**.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 73].

## I.  Background and Statement of Facts

### A.  Background

Defendant is charged with one (1) count of murder in the second degree in violation of 18 U.S.C. §§ 1111, 1151, and 1153(a), as well as, one (1) count of assault resulting in substantial bodily injury in violation of 18 U.S.C. §§ 113(a)(7), 1151, and 1153(a). (Superseding Indictment [Docket No. 31]).

### B.  Facts[2]

The record presently before the Court indicates that in the late evening of November 8, 2019, Red Lake Emergency Medical Services personnel received a call from a female caller, later identified as Defendant's mother, who "stated that an ambulance was needed at the house of Brittany Lynn" Roy because Ms. Roy, the alleged victim in the present case, "got drunk the other day and she hasn't woken up." (Gov't Ex. 6 at 3).[3] At the time the medics arrived at Ms. Roy's residence (hereinafter the "Residence"), there were three persons at the Residence: Ms. Roy, Defendant, and Defendant's mother. (Id.).

Upon arriving at the Residence, the medics were directed by Defendant and his mother to the "back room" where the medics observed Ms. Roy laying "face-up on the edge of the bed . . . breathing rapidly." (Id. at 4). One of the medics described Ms. Roy's shorts as covering her "frontal pubic region, but not her buttocks, in a manner consistent with a person attempting to dress [Ms. Roy] while she was unconscious." (Id.). The same medic described Ms. Roy's bruises

---

[2] The facts contained in this section are derived from the testimony of Special Agent Daniel Eckardt (hereinafter "SA Eckardt") with the Federal Bureau of Investigation and Customs and Border Protection Task Force Officer Mariano Arguedas (hereinafter "TFO Arguedas") at the October 20, 2020, Motions Hearing, as well as, the parties' exhibits presented in the present case.

[3] Government's Exhibit 6 is the warrant application, supporting affidavit, and warrant to search Defendant's Facebook account. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 6. (Tr. 8).

as "old and new," and both medics noted that Ms. Roy was "'full of bruises,' which cover[ed] most of her body." (Id. at 5). The medics observed vomit on the floor next to the bed. (Id.).

The medics began asking Defendant questions regarding Ms. Roy's condition, and the circumstances leading up to her condition. (Id.). Defendant responded that after Ms. Roy had fallen over two days prior "when she got drunk" he had "helped her to bed," but she had not woken up since that time. (Id.). Defendant informed one of the medics that Defendant had not "called the ambulance because he did not know the number." (Id.). Upon further questions from the medics regarding Ms. Roy's condition, Defendant provided only "vague, noncommittal" responses. (Id.).

Ms. Roy was transported to the Red Lake Indian Health Services Hospital. (Id.). During this transportation, one of the medics observed an injury to Ms. Roy's head. (Id. at 6). Based on their interactions with Defendant, the medics became concerned that Ms. Roy was the victim of domestic violence, and based on that suspicion, the medics informed "emergency room staff that [Defendant] should not be allowed to visit" Ms. Roy. (Id.).

Ms. Roy was later flown from the Red Lake Indian Health Services Hospital to the Sanford Health hospital in Fargo, North Dakota where medical personal photographed numerous injuries to Ms. Roy body, including significant bruising on her chest, arms, torso, shoulders, and legs. (Gov't's Ex. 6 at 11–12). It was also discovered that Ms. Roy had "a recent rib fracture on her second rib." (Id.).

Thereafter, law enforcement officers interviewed Ms. Roy's mother, Eunice Whitefeather. (Id.). Upon learning that Ms. Roy had been hospitalized, Ms. Whitefeather asked if she "was hospitalized because [Defendant] had beaten her." (Id.). Ms. Whitefeather explained that Defendant "routinely abuse[d]" Ms. Roy over the course of the previous year while Ms. Roy

and Defendant "had been involved in a romantic relationship." (Id.). Ms. Whitefeather stated that Ms. Roy was "frequently" bruised during the course of her relationship with Defendant. (Id.).

Law enforcement officers also interviewed the person residing in the house next to the Residence. (Id. at 7). The neighbor reported observing Defendant and Ms. Roy "fight in the street in front of their house on a regular basis" approximately "once a week," including one incident where Defendant "dragged [Ms. Roy] back to the house by her arm." (Id.).

On November 12, 2019, TFO Arguedas submitted two federal court applications for search warrants. First, TFO Arguedas submitted a federal court application for a search warrant authorizing the search of the Residence which sought to search for "evidence, fruits, and instrumentalities of violations of Title 18 United States Code, Section 113(1)," which the application further described. (Gov't Ex. 4).[4]

In his affidavit submitted in support of the November 12, 2019, Search Warrant, TFO Arguedas provided the details of the investigation, as described above, and he attested that he had been specifically informed by Ms. Roy's mother that Ms. Roy and Defendant resided together at the Residence. (Id.). TFO Arguedas further attested that based on his training and experience "domestic assaults frequently occur within the context of a pattern of abusive and assaultive behavior." (Id.). TFO Arguedas' affidavit provided that "victims and perpetrators of domestic violence may document incidents in diaries, text messages, photographs, emails, social media posts, and similar media, and that these documents may exist in physical form on papers, or on digital form on various electronic media platforms such as cellular telephones, social media accounts, or tablets." (Id.).

---

[4] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant to search the Residence. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4. (Tr. 8).

The Honorable Jon T. Huseby, Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the November 12, 2019, Search Warrant authorizing law enforcement to search the Residence. (Id.). Magistrate Judge Huseby's signature indicates that he signed the November 12, 2019, Search Warrant at 2:35 p.m. on November 12, 2019. (Id.).

On November 12, 2019, TFO Arguedas also submitted a federal court application for a search warrant authorizing the search of Defendant's person. (Gov't Ex. 5).[5] This November 12, 2019, Search Warrant sought to search for trace evidence, and it further sought permission to photograph and video Defendant's person. (Id.).

In his affidavit submitted in support of the November 12, 2019, Search Warrant seeking authority to search Defendant's person, TFO Arguedas provided the details of the investigation, as described above. (Id.). TFO Arguedas again attested that based on his training and experience "domestic assaults frequently occur within the context of a pattern of abusive and assaultive behavior." (Id.). TFO Arguedas further provided that "individuals who engage in physical fights and/or assaultive behavior often display signs of bruising, open wounds, abrasions, discolorations, defensive wounds, and other physical features indicative of fighting" which "can last days and weeks after the incident" and which "can sometimes contain another's skin cells . . . or other bodily fluids . . . ." (Id.).

Magistrate Judge Huseby determined that probable cause existed to support the issuance of the November 12, 2019, Search Warrant authorizing law enforcement to search Defendant's person. (Id.). Magistrate Judge Huseby's signature indicates that he signed the November 12, 2019, Search Warrant on November 12, 2019. (Id.).

---

[5] Government's Exhibit 5 is the warrant application, supporting affidavit, and warrant to search Defendant's person. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 5. (Tr. 8).

At approximately 5:46 p.m. on November 12, 2019, law enforcement officers executed the November 12, 2019, Search Warrant which authorized the search of the Residence where the incident underlying the present case. (See, Gov't Ex. 8;[6] Gov't Ex. 6 at 10). During the search of the Residence, law enforcement officers discovered "a single empty alcohol bottle"; "several holes in the walls, consistent with being caused by fists or thrown items"; "a broken flat screen television"; "a cellular phone with a broken screen" which "was located on the floor below a hole in the drywall, which [law enforcement described as being] consistent with a phone being thrown at the drywall"; and "various items of bedding, which appeared to have blood and/or urine" on them. (Gov't Ex. 6 at 10).

---

[6] For the first time in his memorandum, Defendant asserts that this search occurred at "01:00 AM EST" on November 12, 2019. (Def.'s Mem., [Docket No. 70], at 8). In support of this assertion, Defendant points to a single line of a "collection log" which indicates that a "[f]itted sheet" was collected from the Residence at "01:00 AM EST," and TFO Arguedas' testimony that the "log" was generally accurate. Defendant's contention is unsupported by the record now before the Court. As a threshold issue, TFO Arguedas did not specifically testify that the time stamps of the "collection log" where correct; in fact, at the October 20, 2020, Motions Hearing, Defendant failed to ask TFO Arguedas any questions regarding the time stamps on the "collection log." TFO Arguedas only testified that he had no "reason to believe that" the log was "inaccurate . . . ." (Tr. 77). The Government was unable to cross-examine TFO Arguedas regarding the "time stamps" because Defendant did not raise the issue of the time stamps until Defendant filed his written, supplemental memorandum after the October 20, 2020, Motions Hearing. Moreover, the "collection log" upon which Defendant relies is Defendant's Exhibit 1 which Defendant failed to provide to the Court as his counsel was directed to do at the October 20, 2020, Motions Hearing. (Tr. 7, 75) (directing Defendant's counsel to mail Defendant's Exhibits to the Court pursuant to this District's COVID-19 protocols). Without Defendant's Exhibit 1 the Court cannot ascertain the time stamps assigned to the other items on the "collection log." Further, other evidence in the record demonstrates that the search of the Residence pursuant to the November 12, 2019, Search Warrant was conducted at approximately 5:46 p.m. on November 12, 2019, which is consistent with TFO Arguedas' testimony. At the October 20, 2020, Motions Hearing, TFO Arguedas' testimony indicated that he executed the November 12, 2019, Search Warrant after it was signed by Judge Huseby. The other evidence in the record which demonstrates that the search occurred at 5:46 p.m. is Government's Exhibit 8 which is three pages of the "Evidence Response Team Casebook" related to the November 12, 2019, search of the Residence pursuant to the November 12, 2019, Search Warrant. The Government presented Exhibit 8 with its written, supplemental memorandum filed in response to Defendant's written, supplemental memorandum. Based on the record now before the Court, Government's Exhibit 8 is a proper rebuttal exhibit in response to Defendant's untimely exhibits which the Court previously admitted at the October 20, 2020, Motions Hearing despite Defendant's failure to comply with this Court's previous Order, [Docket No. 59], which required the parties to pre-mark "all possible exhibits that they may consider introducing into evidence during the October 20, 2020, evidentiary hearing" and to provide those exhibits to the Court because of the circumstances surrounding the COVID-19 pandemic. If Defendant had complied with the Court's previous Order, [Docket No. 59], then the Government's Exhibit 8, which is responsive to Defendant's Exhibit 1, could have been presented at the October 20, 2020, Motions Hearing. Government's Exhibit 8 is admitted.

On November 13, 2019, SA Eckardt received a telephone call from TFO Arguedas requesting that SA Eckardt locate and interview Defendant. (Tr. 10–11).[7] TFO Arguedas informed SA Eckardt that Ms. Roy was "in intensive care," and Defendant "was with [her] in or around the time of the incident." (Tr. 11). Upon receiving this call, SA Eckardt began driving to Alexandria, Minnesota where Defendant was believed to be residing. (Tr. 12–15). With the assistance of Investigator Jay Halverson of the Alexandria Police Department, SA Eckardt located Defendant's mother's residence where Defendant was believed to be residing. (Id.). After SA Eckardt arrived at the Alexandria Police Department, he and Inv. Halverson drove in Inv. Halverson's unmarked patrol vehicle to Defendant's mother residence in an attempt to interview Defendant. (Id.).[8]

Upon arriving at Defendant's mother's residence, the officers knocked on the door, and Defendant's mother answered the door. (Id.). SA Eckardt and Inv. Halverson identified themselves, and they asked if Defendant was at the residence. (Id.). Defendant's mother responded that Defendant was "sleeping downstairs," and she invited the officers into the residence. (Id.). After entering the residence, SA Eckardt asked if he could speak with Defendant, and Defendant's mother said, "she would go get him . . . ." (Tr. 16). While she went into the basement to get Defendant, Inv. Halverson and SA Eckardt stayed in the living room near the entryway to the residence. (Tr. 16–18).

When Defendant came up from the basement, Inv. Halverson and SA Eckardt again identified themselves, and they informed Defendant that they needed to speak with "him about

---

[7] Throughout this Report and Recommendation, the Court refers to the transcript of the October 20, 2020, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 72]).

[8] At the October 20, 2020, Motions Hearing, SA Eckardt testified that both he and Inv. Halverson were wearing "normal street clothes." (Tr. 14). In addition, both SA Eckardt and Inc. Halverson had their side arm weapon, however, neither SA Eckardt nor Inv. Halverson's side arm was visible. (Id.).

the incident on the reservation." (Tr. 18). Defendant responded that "he knew [they] were going to come talk to him at some point in time." (Id.).

SA Eckardt asked Defendant and his mother if they would be willing to come to the police department to talk about the incident. (Id.). SA Eckardt informed Defendant that although SA Eckardt "would really like [Defendant] to come with" the officers to the police department, it was "up to [Defendant]." (Tr. 20). Defendant and his mother agreed to go to the police department to speak with the officers. (Tr. 18–20). SA Eckardt asked Defendant "if it would be okay with him if he rode with [the officer] over to the police department," and he agreed to do so. (Id.). Defendant rode in the back seat of Inv. Halverson's unmarked patrol vehicle, and Defendant's mother followed the unmarked patrol vehicle to the Alexandria police department. (Id.). The drive to the Alexandria police department from Defendant's mother's residence took approximately five minutes. (Id.).

Upon arriving at the Alexandria police department, SA Eckardt, Inv. Halverson, Defendant, and Defendant's mother entered in through the public entrance. (Tr. 22–26). SA Eckardt and Inv. Halverson interviewed Defendant and Defendant's mother in an interview room directly adjacent to the public lobby which was connected to the interview room by an unlocked door. (Id.). The officers interviewed Defendant first, and then they interviewed Defendant's mother while Defendant waited in the public lobby.

SA Eckardt began the interview by thanking Defendant for coming in to speak with law enforcement, and he again informed Defendant that his speaking with law enforcement was "all voluntary," that Defendant could "leave whenever [he] want[ed]," and Defendant did not have to answer any questions. (Gov't's Ex. 1).[9] SA Eckardt and Defendant then discussed the history of

---

[9] Government's Exhibit 1 is a video recording of the interview with Defendant. At the Motions Hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 1. (Tr. 8).

Defendant's relationship with Ms. Roy before discussing the incident underlying the charges in the present action. (Id.). At times while SA Eckardt and Defendant discussed Defendant "fighting" with Ms. Roy, Defendant became tearful. (Id. at 11:25–12:20). Although Defendant admitted that he and Ms. Roy had been involved in a physical altercation, he stated that Ms. Roy had hit him first. (Id.). Defendant further admitted that he and Ms. Roy had been consuming alcohol and using methamphetamines in the days leading up to the incident which resulted in Ms. Roy's injury. (Id.).

During the interview, Defendant yawned; placed his head into his hands; and on at least one occasion, he placed his head on the table; however, Defendant remained cooperative and responsive to the officers' inquiries. (Id.). SA Eckardt concluded the interview by thanking Defendant for speaking with the officers.

The officers then spoke to Defendant's mother. After the completion of the interview of Defendant's mother, SA Eckardt asked Defendant to return to the interview room, and SA Eckardt executed the November 12, 2019, Search Warrant authorizing the search of Defendant's person, including the taking of pictures of Defendant's person. (Tr. 25–27). After the execution of the Search Warrant, Defendant left the police department. (Id.).

At some point in time unspecified on the record now before the Court, it was discovered that Ms. Roy's injuries resulted in "partial brain death" which required "life-support" for her to remain breathing. (Id.). On November 21, 2019, Ms. Roy's "family disconnected her from life support at approximately 2:00 p.m.," and Ms. Roy died. (Id. at 12).

On November 23, 2019, Defendant was arrest pursuant to a federal warrant authorizing his arrest in the present case. (Tr. 57–60). Defendant was then taken to the Douglas County jail in Alexandria, Minnesota. (Id.).

Upon learning of Defendant's arrest, TFO Arguedas drove to the Douglas County jail to transfer Defendant to the Beltrami County jail in Bemidji, Minnesota. (Id.). TFO Arguedas also sought to interview Defendant. Upon arriving at the Douglas County jail, TFO Arguedas met with Defendant in a room used for inmate booking and intake. (Id.).

TFO Arguedas testified at the October 20, 2020, Motions Hearing that he read aloud to Defendant a recitation of his Miranda[10] rights from an Advice of Rights form which TFO Arguedas referred to as a FD-395. (Tr. 60). "After determining that [Defendant] could read and write without glasses," TFO Arguedas gave Defendant the Advice of Rights form, and permitted Defendant time to read it. (Id.). After reading the Advice of Rights form, Defendant signed it, and both TFO Arguedas and Task Force Officer Pam Hodgen signed the form as witnesses. (Gov't's Ex. 3).[11]

At the October 20, 2020, Motions Hearing, TFO Arguedas testified that he did not begin questioning Defendant in the Douglas County jail because he wanted to get Defendant "to Beltrami County jail sooner rather than later" so that he could get food and "through the Beltrami County intake process" in a timely manner. (Tr. 62). TFO Arguedas also secured a "bag lunch" for Defendant to eat during the drive to Beltrami County jail. (Tr. 62). TFO Arguedas began questioning Defendant after he and Defendant "left city limits," and TFO Arguedas audio recorded the interview of Defendant. (Id.). Task Force Officer Pam Hodgen also rode in the patrol vehicle with TFO Arguedas and Defendant. (Tr. 65).

TFO Arguedas began the questioning of Defendant by advising Defendant that TFO Arguedas had viewed the video recording of Defendant's previous statement to law enforcement.

---

[10] Miranda v. Arizona, 384 U.S. 436 (1966).
[11] Government's Exhibit 3 is Advice of Rights form signed by Defendant on November 23, 2019. At the Motions Hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 3. (Tr. 8).

(Gov't's Ex. 2).[12] TFO Arguedas asked Defendant if they could discuss the particulars of Defendant's previous statement to law enforcement, and Defendant agreed. Thereafter, TFO Arguedas and Defendant began discussing Defendant's previous statement and the circumstances giving rise to the present case. (Gov't's Ex. 2 at 2:01–57:01). Approximately fifty-seven minutes into the interview, Defendant stated that the was "done talking," and TFO Arguedas concluded the interview. (Id. at 56:50–57:22). Throughout the interview, Defendant remained cooperative, and he responded appropriately to each of TFO Arguedas' inquiries.

On November 26, 2019, TFO Arguedas submitted two federal court applications seeking authorization to search the contents of two Facebook accounts. First, TFO Arguedas submitted an application to search the contents of Defendant's Facebook account. (Gov't's Ex. 6). In "Section I" of "Attachment B" of his application, TFO provided that he sought a search warrant requiring Facebook to disclose all contact and personal identification information; all activity logs; all photos and videos; all profile information; all communications, including pending "Friend" requests; all location information, including physical location and IP logs; all record of the account's usage of the "Like" or "fan" feature; all searches conducted by the account; all "lists of friends created by the account"; all information related to the account's "access and use of Facebook Marketplace"; "types of services utilized by the user," including the length of that service and the payment method used; the account settings; and all records of communications between Facebook and any person regarding the account. (Id.). In "Section II" of "Attachment B" of the application, the application provided that it sought authorization for law enforcement to seize only the following:

> All information [disclosed by Facebook] in Section I that constitutes fruits,
> evidence and instrumentalities of violations of Title 18, United States Code,

---

[12] Government's Exhibit 2 is an audio recording of the November 23, 2019, interview with Defendant. At the Motions Hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 2. (Tr. 8).

Section 113(a)(7)(Assault Resulting in Substantial Bodily Injury), involving [Defendant], or other potential suspects, during the period of September 3, 2018 to the present [November 26, 2019], including . . . information pertaining to the following matters:

(a) Communications related to [Ms. Roy], her hospitalizations, injuries, or assault thereof;

(b) Photographs of [Ms. Roy] and/or [Defendant] evidencing the relationship between the two;

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s). [sic]

(f) The identity of the person(s) who communicated with the user ID about matters relating to domestic assaults (past or present) and/or any domestic assault of [Ms. Roy], including records that help reveal their whereabouts and intentions;

(g) Any communications related to any assault regarding any individual, including [Ms. Roy]; [and]

(h) Any evidence regarding the nature of the relationship between [Defendant] and [Ms. Roy], including messages, relationship origins, duration, indicia of a relationship, or indicia or arguments, assaults, and violence.

(Id.).

In the affidavit TFO Arguedas submitted in support of the November 26, 2019, Facebook Search Warrant related to Defendant's Facebook account, TFO Arguedas provided the details of the investigation as described above. (Id.). TFO Arguedas attested that a public search of Defendant's Facebook account indicated that Defendant was in a "Facebook relationship" with Ms. Roy, and TFO argues further attested that based on his training and experience "individuals who are in [a] 'Facebook relationship' typically share private messenger communications which demonstrate the nature, extent, and substance of the relationship." (Id.). TFO Arguedas also attested that on November 10, 2019, Defendant and Ms. Roy's mother had exchanges messages "on Facebook messenger" which "included statements by [Defendant] indicating his actions

leading up to [Ms. Roy] being transported to the" Sanford Health Hospital in Fargo, North Dakota. (Id.).

In his affidavit, TFO Arguedas also provided information regarding the "functionality" of Facebook in regard to search warrants. (Id.). TFO Argues attested that "[u]pon receipt of the information described in Section I of Attachment B, government-authorized persons [would] review that information to locate the items described in Section II of Attachment B." (Id.).

On November 26, 2019, Magistrate Judge Huseby determined that probable cause existed to support the issuance of the November 26, 2019, Search Warrant authorizing the search of Defendant's Facebook account. (Id.). Thereafter, law enforcement officers executed the November 26, 2019, Search Warrant.

TFO Arguedas also submitted an application to search the contents of Ms. Roy's Facebook account. (Gov't's Ex. 7).[13] In "Section I" of "Attachment B" of his application, TFO provided that he sought a search warrant requiring Facebook to disclose the same information listed in "Section I" of "Attachment B" in the application for a search warrant authorizing law enforcement to search Defendant's Facebook account. (Id.). In "Section II" of "Attachment B" of the application for a search warrant to search the contents of Ms. Roy's Facebook account, the application provided that it sought authorization for law enforcement to seize only the same information as provided for in the application for a search warrant to search Defendant's Facebook account. (Id.).

In the affidavit TFO Arguedas submitted in support of the November 26, 2019, Facebook Search Warrant related to Ms. Roy's Facebook account, TFO Arguedas provided the details of the investigation as described above. (Id.). TFO Arguedas attested that a public search of Ms.

---

[13] Government's Exhibit 7 is the warrant application, supporting affidavit, and warrant to search Ms. Roy's Facebook account. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 7. (Tr. 8).

Roy's Facebook account indicated that Defendant was in a "Facebook relationship" with Ms. Roy, and TFO Arguedas again attested that based on his training and experience, "individuals who are in [a] "Facebook relationship" typically share private messenger communications which demonstrate the nature, extent, and substance of the relationship." (Id.). TFO Arguedas also attested that a public search of Ms. Roy's account had revealed "a number of photographs evidencing a friendship or relationship between [Ms. Roy] and [Defendant]." (Id.). Like in his application in support of the issuance of a search warrant authorizing law enforcement to search Defendant's Facebook account, TFO Arguedas, in his affidavit related to Ms. Roy's Facebook account, attested that "[u]pon receipt of the information described in Section I of Attachment B, government-authorized persons [would] review that information to locate the items described in Section II of Attachment B." (Id.).

On November 26, 2019, Magistrate Judge Huseby determined that probable cause existed to support the issuance of the November 26, 2019, Search Warrant authorizing law enforcement officers to search Ms. Roy's Facebook account. (Id.). Thereafter, law enforcement officers executed the November 26, 2019, Search Warrant.

## II. Defendant's Motion to Suppress Evidence. [Docket No. 41].

Defendant seeks an Order of this Court suppressing all evidence flowing from the four federal court search warrants outlined above. (Def.'s Mot. [Docket No. 41]). Specifically, Defendant seeks to suppress all evidence flowing from the November 12, 2019, Search Warrant authorizing the search of the Residence; the November 12, 2019, Search Warrant authorizing the search and photographing of Defendant's person; the November 26, 2019, Search Warrant authorizing the search of Defendant's Facebook account; and the November 26, 2019, Search Warrant authorizing the search of Ms. Roy's Facebook account. (Def.'s Mem., [Docket No. 70], at 4–12).

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the

warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 9-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (alterations in Wiley) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### B. Defendant's Perceived Irregularities in the Search Warrants

Defendant argues that the evidence flowing from all four Search Warrants presently at issue should be suppressed based on perceived "irregularities" in the application process for the November 26, 2019, Search Warrant authorizing the search of Ms. Roy's Facebook account. (Def.'s Mem., [Docket No. 70], at 4–7). Specifically, Defendant contends that TFO "Arguedas failed to sign the application after presenting it to Magistrate Judge Huseby." (Id. at 5). Defendant bases this contention on Defendant's Exhibit 2 which is a copy of the first page of the November 26, 2019, application for a search warrant which is signed by Judge Huseby, but which is not signed by TFO Arguedas. (Id.). Although there is a copy of this first page signed only by Judge Huseby, the Government's produced copy of the warrant application, supporting affidavit, and warrant authorizing the search of Ms. Roy's Facebook account is properly signed by TFO Arguedas and Judge Huseby on the first page.

Defendant's argument is unpersuasive, and the contention upon which it is based is unsupported by the record. The record now before the Court clearly indicates that TFO Arguedas did sign the application when presenting it to Judge Huseby. The Government has produced a

copy of the application for a search warrant bearing the signature of both TFO Arguedas and Judge Huseby. Defendant's contention that this signature may have nefariously occurred outside the presence of Judge Huseby is purely speculative, and it fails to find any factual support in the record now before the Court. Defendant's argument here is based on nothing more than pure speculation.

Further, there is no requirement, constitutional or otherwise, that TFO Arguedas sign the application for a search warrant. The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, there is no requirement that this oath or affirmation be in writing. In fact, Federal Rules of Criminal Procedure specifically provide that a warrant may be based on sworn oral testimony. See, Fed. R. Crim. P. 41(d)(2)(B).

In the present case, TFO Arguedas specifically testified that while he applied for the November 26, 2019, Search Warrant, Judge Huseby placed him under oath. (Tr. 84). Defendant does not refute this testimony. Thus, the "Oath or affirmation" requirement of the Fourth Amendment is satisfied.

On a more fundamental level, Defendant lacks standing to challenge the November 26, 2019, Search Warrant authorizing the search of Ms. Roy's Facebook account.

As noted above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, Fourth Amendment rights are personal, and therefore, they may not be asserted vicariously. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133–34 (1978)).

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Barragan, 379 F.3d at 529 (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)); Rakas, 439 U.S. at 133–34. The Defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31.

To establish a legitimate expectation of privacy, the Defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

The Eighth Circuit has enumerated factors for Courts to consider in deciding whether a Defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

The affidavit submitted in support of the November 26, 2019, Search Warrant does not offer any indication that Defendant has any privacy interest in Ms. Roy's Facebook account. Further, and most important, Defendant fails to make any attempt before this Court to establish that he has standing to challenge the November 26, 2019, Search Warrant authorizing the search

18

of Ms. Roy's Facebook account. Defendant fails to offer any factual basis upon which the Court could reasonably conclude that he had a personal privacy interest in Ms. Roy's Facebook account.

On the record now before the Court each of the above delineated factors weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from the November 26, 2019, Search Warrant authorizing the search of Ms. Roy's Facebook account. Defendant fails to even allege that he has an ownership interest or control over Ms. Roy's Facebook account; fails to offer any factual allegation that he ever had access to Ms. Roy's Facebook account or had an ability to regulate use of Ms. Roy's Facebook account; and he fails to even allege that he had a subjective expectation of privacy in Ms. Roy's Facebook account. Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in Ms. Roy's Facebook account.

It is Defendant who bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. Regarding Ms. Roy's Facebook account subject to the November 26, 2019, Search Warrant, Defendant has wholly failed to meet this burden.

On that basis, the Court concludes that Defendant lacks standing to challenge the search of Ms. Roy's Facebook account, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the execution of the November 26, 2019, Search Warrant authorizing the search of the contents of Ms. Roy's Facebook account.

As discussed above, Defendant argues that the perceived "irregularities" in TFO Application process warrants suppression of evidence flowing from all four Search Warrants now at issue; however, in his discussion, Defendant highlights only the November 26, 2019, application for a search warrant authorizing the search of Ms. Roy's Facebook account. Defendant fails to articulate how an alleged irregularity in the application process for one search

19

warrant could necessitate the suppression of evidence flowing from three separate search warrants without any evidence of any irregularity in the application process for the three separate search warrants. (See, Id.). In any event, the Court has now determined that there were no constitutional infirmities in the process TFO Arguedas used in submitting the November 26, 2019, application for a search warrant authorizing law enforcement to search Ms. Roy's Facebook account.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing any evidence flowing from the execution of the November 26, 2019, Search Warrant which authorized law enforcement officers to search Ms. Roy's Facebook account, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 41], be **DENIED** based on Defendant's lack of standing to challenge said Search Warrant. Further, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence flowing from all four Search Warrants now at issue based on Defendant's perceived "irregularities" in the search warrant application process, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 41], be **DENIED**.

### C. Search Warrant for Residence

Defendant also seeks an Order of this Court suppressing all evidence flowing from the execution of the November 12, 2019, Search Warrant authorizing the search of the Residence. Defendant' sole argument in support of this request is that the search was conducted "outside the scope of the search warrant" because, according to Defendant, the search of the Residence occurred before Judge Huseby signed the November 12, 2019, Search Warrant. (Def.'s Mem., [Docket No. 70], at 7–9). Defendant bases this contention on a single line in a "collection log" which indicates that a "[f]itted sheet" was collected on November 12, 2019, at 1:00 a.m. Eastern Standard Time. (See, Id. at 8).

As discussed above, however, Defendant's contention that the search of the Residence occurred before Judge Huseby signed the November 12, 2019, Search Warrant is unsupported by the record now before the Court. Instead, the record now before the Court clearly demonstrates that the search of the Residence occurred only *after* Judge Huseby signed the November 12, 2019, Search Warrant which authorized the search of the Residence.

Other than this "scope" based challenge and his perceived "irregularities" challenge discussed above, Defendant does not otherwise challenge the November 12, 2019, Search Warrant which authorized law enforcement to search the Residence. Defendant does not refute that the application and affidavit submitted in support of the November 12, 2019, Residence Search Warrant provided a sufficient basis upon which Judge Huseby could conclude that probable causes existed to support the issuance of the November 12, 2019, Search Warrant which authorized law enforcement to search the Residence.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence flowing from the execution of the November 12, 2019, Search Warrant which authorized law enforcement to search the Residence, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 41], be **DENIED**.

### D.  Search Warrant for Defendant's Facebook Account

Defendant next seeks an Order of this Court suppressing evidence flowing from the execution of the November 26, 2019, Search Warrant which authorized law enforcement to search Defendant's Facebook account. (Def.'s Mem., [Docket No. 70], at 9–12). In support of this request, Defendant argues that the Facebook Search Warrant was "overbroad" because it merely "listed 16 distinct categories to be searched," including any "likes" or "pokes" Defendant "has ever made" and Defendant's activity on "Facebook Marketplace" which Defendant describes as having no relation "to the hospitalization of Ms. Roy," and because "the search

warrant contained no time limitations." (Id.). Defendant also argues that "the categories of seizure described in the warrant are also overbroad" asserting that TFO "Arguedas gives no reasoning why he requires the seizure of information from over a year before the incident involving Ms. Roy occurred; that "the seizure of 'evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographical context of the account access' is overbroad because TFO "Arguedas makes no argument as to why he would need to know the geographical location of [Defendant] at any point in time between September 3, 2018, to the present day." (Id.).

As observed above, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing the place to be searched</u>, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). To satisfy the particularity requirement, the place to be search must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or seizing the wrong items. <u>United States v. Gitcho</u>, 601 F.2d 369, 371 (8th Cir. 1979); <u>United States v. Thomas</u>, 263 F.3d 805, 808 (8th Cir. 2001); <u>United States v. Gleich</u>, 397 F.3d 608, 611 (8th Cir. 2005). "[T]he warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." <u>United States v. Sigillito</u>, 759 F.3d 913, 923 (8th Cir. 2014) "[T]he degree of specificity required will depend on the circumstances of the case and on the type of items involved. This particularity standard is one of 'practical accuracy rather than' of hypertechnicality." <u>United States v. Sigillito</u>, 759 F.3d 913, 923 (8th Cir. 2014); <u>see</u>, <u>Groh v. Ramirez</u>, 540 U.S. 551, 557 (2004); <u>United States v. Fitzgerald</u>, 724 F.2d 633, 637 (8th Cir.1983).

"Typically, a warrant that is not particular enough cannot be cured by the specificity of the affidavit supporting it" because "[s]pecificity is required in the warrant itself in order to limit

the discretion of the executing officers as well as to give notice to the party searched." United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001) (citing United States v. Johnson, 541 F.2d 1311, 1315 (8th Cir. 1976)). "However, if the affidavit is incorporated into the warrant, it may cure the particularity defect of the warrant if the affidavit accompanies the warrant and the warrant uses suitable words of reference to incorporate the affidavit." Thomas, 263 F.3d at 808.

On the record now before the Court, the November 26, 2019, Search Warrant authorizing the search of Defendant's Facebook account satisfies the Fourth Amendment's particularity requirement, and it is not constitutionally overbroad. Although the November 26, 2019, Search Warrant authorizing the search of Defendant's Facebook account contained categories of information to be produced by Facebook, those categories were specifically defined and the Search Warrant incorporated "Attachment B" which specifically limited the items to be seized to information "that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 113(a)(7) (Assault Resulting in Substantial Bodily Injury), involving [Defendant], or other potential suspects, during the period of September 3, 2018 to the present . . . ." (Gov't's Ex. 6). In addition to this limiting language, "Attachment B" to the November 26, 2019, Search Warrant also described the types of information which would be included in this limited subset of information. (Id.).

The Eighth Circuit Court of Appeals has found similar limiting language to satisfy the particularity requirement of the Fourth Amendment. United States v. Gleich, 397 F.3d 608, 612 (8th Cir. 2005); United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008); United States v. Sherman, 372 F. App'x 668, 676 (8th Cir. 2010). In so finding, the Eighth Circuit Court of Appeals reasoned that such limiting language "adequately allowed the police to avoid searching and seizing the wrong items." Gleich, 397 F.3d at 612.

The same is true in the present case. The limiting language in "Attachment B" to the November 26, 2019, Search Warrant provides a constitutionally adequate basis to allow law enforcement officers searching Defendant's Facebook account to avoid searching and seizing the wrong information.

Defendant also contends that the delineated categories to be searched are overly broad because they include information outside of the information to be seized which may not be relevant to the investigation underlying the present case and because the categories were not temporally limited. (Def.'s Mem., [Docket No. 70], at 9–11). In support of this argument, Defendant relies on only non-controlling cases from outside this District which assigned a heighten standard to search warrants directed at Facebook accounts. Such a standard has not been adopted by this District, and the Court finds unpersuasive both this cases and Defendant's argument. The Eighth Circuit court of Appeals has repeatedly stated that "[t]he failure of the warrant to anticipate the precise form in which [the sought information] would appear is not fatal." United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995).[14]

Regarding the description of the place to be searched, the Fourth Amendment requires that the place to be search be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises. United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979); United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001); United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005). The November 26, 2019, Search Warrant which authorized law enforcement officers to search Defendant's Facebook account sufficiently described the Facebook account to be searched in a manner which precluded mistakenly searching the wrong

---

[14] Defendant's argument here is more akin to a relevancy based objection. The standard here, however, is not one of relevancy.

Facebook account. The Facebook account was identified by the specific account number, and the Search Warrant delineated the items to be included in the search.

On the above basis, the Court finds that the November 26, 2019, Search Warrant which authorized law enforcement officers to search Defendant's Facebook account satisfies the Fourth Amendment's particularity requirement. The Search Warrant is not constitutionally overbroad.

Other than this particularity challenge and his perceived "irregularities" challenge already discussed above, Defendant does not otherwise challenge the November 26, 2019, Search Warrant which authorized law enforcement to search his Facebook account. Defendant does not refute that the application and affidavit submitted in support of this November 26, 2019, Search Warrant provided a sufficient basis upon which Judge Huseby could conclude that probable causes existed to support the issuance of said November 26, 2019, Search Warrant.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence flowing from the execution of the November 26, 2019, Search Warrant which authorized law enforcement to search his Facebook account, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 41], be **DENIED**.

**III.    Defendant's Motions to Suppress Statements. [Docket No. 42].**

Defendant moves this Court for an Order suppressing his November 13, 2019, statements to SA Eckardt and Inv. Halverson, as well as, his November 23, 2019, statements to TFO Arguedas. (See, Def.'s Mot. [Docket No. 42]). In support of this request, Defendant argues that these statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Def.'s Mem., [Docket No. 70], at 12–16).

**A.  Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised

of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444–45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B.  Defendant's November 13, 2019, Statements**

Defendant contends that his November 13, 2019, statements to SA Eckardt and Inv. Halverson should be suppressed pursuant to Miranda because law enforcement officers failed to provide Defendant with a Miranda warning, and at the time he made the statements the "circumstances demonstrate that [he] was subjected to custodial interrogation." (Def.'s Mem., [Docket No. 70], at 12–14).

26

Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)). It is undisputed that SA Eckardt and Inv. Halverson's express questioning of Defendant constituted interrogation. Accordingly, the sole issue before the Court is whether Defendant was in custody for the purpose of Miranda during his interview with SA Eckardt and Inv. Halverson on November 13, 2019. See, United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) ("[T]he undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether Miranda rule applies, we must examine whether [the] interrogation was custodial.")

The Eighth Circuit has explained:

[W]e outline six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case to present all indicial; and a particular strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Id. at 500–01 (citations omitted). "These factors, however, are not exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (citations and quotation marks omitted). "The analysis depends upon a review of the totality of the circumstances, and [t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir. 2012) (citations and quotations omitted) (alterations in Sanchez).

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Id. at 631. In the present case, SA Eckardt began his interaction with Defendant at the Residence by telling Defendant the decision of whether or not to come with the officers to the police station to talk to law enforcement was entirely Defendant's decision, and Defendant voluntarily agreed to go to the Alexandria police station to speak with SA Eckardt and Inv. Halverson. Moreover, upon arriving at the police station and beginning the interview SA Eckardt again informed Defendant that his speaking with law enforcement was "all voluntary," that Defendant could "leave whenever [he] want[ed]," and Defendant did not have to answer any questions.

Thus, in the present case, this factor weighs strongly, if not controllingly, in favor of finding that Defendant was not in custody at the time of his November 13, 2019, statements to SA Eckardt and Inv. Halverson. See, e.g., United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (noting that the Eighth Circuit Court of Appeals has "never held that a person was in custody after" the person was informed he was free to leave and did not have to answer questions) (emphasis added); United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004); United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that

28

the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning."); United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). Accordingly, the fact that SA Eckardt twice informed Defendant that the decision on whether to talk to law enforcement officers was completely voluntary, that Defendant voluntarily agreed to speak with SA Eckardt and Inv. Halverson, and SA Eckardt told Defendant was free to leave strongly mitigates in favor of finding that Defendant was not in custody. See, Ollie, 442 F.3d at 1138.

The record presently before the Court is somewhat limited regarding whether Defendant possessed the freedom to move about during the interview on November 13, 2019. The inquiry here is how it would have objectively appeared to someone in Defendant's position regarding whether or not he had freedom of movement. See, United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008). Here, SA Eckardt specifically informed Defendant that he was free to "leave whenever [he] want[ed]"; however, there is no indication in the record that Defendant actually attempted to leave during the interview. On the present record, this second mitigating factor in neutral. See, Ollie, 442 F.3d at 1138.

The third factor, which addresses whether Defendant initiated contact with the police or voluntarily acquiesced to the questioning by the police, mitigates in favor of finding that Defendant was not in custody as Defendant voluntarily agreed to speak with law enforcement. See, Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning).

In the present case, SA Eckardt told Defendant that the decision on whether or not to proceed to the Alexandria police department to speak with law enforcement was entirely "up to [Defendant]," and Defendant then voluntarily agreed to go to the Alexandria police department

29

to speak with SA Eckardt and Inv. Halverson. Further, once the interview began at the police department, SA Eckardt again informed Defendant that the speaking with law enforcement was "all voluntary," that Defendant could "leave whenever [he] want[ed]," and Defendant did not have to answer any questions.

The fourth factor, which addresses whether law enforcement used strong arm tactics or deceptive stratagems against a suspect during the questioning, does not aggravate in favor of finding that Defendant was in custody during the November 13, 2019, interview. The Court finds no evidence on the present record of strong arm tactics or deceptive stratagems being used against the Defendant during the November 13, 2019, interview.

Defendant conclusorily asserts that this factor weighs in favor of finding he was in custody because he was asleep when his mother invited SA Eckardt and Inv. Halverson into the house. (Def.'s Mem., [Docket No. 70], at 13). The undersigned finds the assertion unpersuasive. Defendant does not articulate how his having been asleep when the officers entered the house demonstrates that he was in custody during the November 13, 2019, interview. Defendant fails to articulate, and this Court does not find, any legal authority to support his contention that his merely being asleep at the time his mother invited the officers into the house in any way indicates he was in custody during the November 13, 2019, interview with SA Eckardt and Inv. Halverson. Moreover, after Defendant was awaken by his mother and enter the living room where SA Eckardt and Inv. Halverson were waiting, SA Eckardt informed Defendant of the purpose for the visit.

The fifth factor, which addresses whether questioning took place in a "police dominated atmosphere," does not aggravated in favor of finding that Defendant was in custody during the November 13, 2019, interview. The record now before the Court, including the video recording

of the November 13, 20019, interview lacks any evidence that the November 13, 2019, interview of Defendant by SA Eckard and Inv. Halverson took place in a "police dominated atmosphere."

Defendant implies that this factor weighs in favor of finding he was in custody because the interview took place in a "small, windowless room" with SA Eckardt and Inv. Halverson sitting "opposite [Defendant] at the table." (Def.'s Mem., [Docket No. 70], at 13). Here again, Defendant fails to articulate any legal authority in support of this contention.

The Court finds unpersuasive Defendant's argument here. The video recording of the November 13, 2019, interview of Defendant by SA Eckardt and Inv. Halverson demonstrates that the interview took place with only two officers present in an adequately sized room and not in a "police dominated atmosphere." Under similar circumstances where two officers were conducted an interview of a single defendant in a small room this Court found that the environment there did not create a "police dominated atmosphere." See, e.g., United States v. Lofald, No. 15-cr-70 (ADM/LIB), 2015 WL 4636631, at *20 (D. Minn. Aug. 3, 2015).

Moreover, an environment is not a "police dominated atmosphere" simply because it took place at a police station. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). This is not a circumstance where Defendant was placed into a secured interrogation room or even an unlocked interrogation room in the secure portion of a police department. Instead, Defendant was brought into an unlocked room directly adjacent to the public lobby and entryway of the police station, and he was told he was free to leave whenever he wished. Accordingly, the fifth factor does not aggravate in favor of Defendant being in custody during the November 13, 2019, interview.

Lastly, the sixth factor, which addresses whether Defendant was arrested at the end of the interview, fails to aggravate in favor of finding that Defendant was in custody during the November 13, 2019, interview with SA Eckardt and Inv. Halverson.

In the present case, Defendant was in fact <u>not</u> arrested upon the conclusion of his November 13, 2019, interview. Likewise, at no time before, during, or after the interview was Defendant ever even handcuffed by law enforcement officers. After the conclusion of his interview, Defendant waited in the public lobby while the officers spoke to his mother, and then he reentered the room for the execution of the search warrant of his person. Defendant then left the police department.

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the November 13, 2019, interview and, as such, Defendant was not in custody during the November 13, 2019, interview. Because Defendant was not in custody for the purposes of <u>Miranda</u> during the November 13, 2019, interview, Defendant is not entitled to have the statements he made during that interview suppressed pursuant to <u>Miranda</u>.

Therefore, to the extent Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 42], seeks an Order of this Court suppressing Defendant's statements made during the November 13, 2019, interview, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 42], be **DENIED**.

### C.  Defendant's November 23, 2019, Statement

As already noted above, Defendant also moves the Court for an Order suppressing his statements during his November 23, 2019, interview with TFO Arguedas while Defendant was being transported from the Douglas County Jail to the Beltrami County Jail. It is undisputed that Defendant was in custody at the time he made these statements. It is likewise undisputed that

TFO Arguedas' express questioning of Defendant on November 23, 2019, constituted interrogation.

The record also clearly demonstrates that Defendant was read a <u>Miranda</u> warning before the interview began, and he both verbally and in writing acknowledged he understood the rights warning. The Advice of Rights form signed by Defendant represents a waiver of those rights.

Accordingly, the only issue now before the Court regarding Defendant's November 23, 2019, interview is whether Defendant's waiver of his rights was made knowingly and intelligently.

Before a statement procured through custodial interrogation can be admitted in Court, the Government must demonstrate that a defendant's wavier of his rights was made intelligently, knowingly, and voluntarily. <u>Miranda</u>, 384 U.S. at 444, 475. The validity of a <u>Miranda</u> waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the <u>Miranda</u> waiver by a preponderance of the evidence." <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004).

<u>1. Voluntariness</u>[15]

Courts assess whether a waiver of rights pursuant to <u>Miranda</u> was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any

---

[15] Although Defendant does not argue that his <u>Miranda</u> waiver was made involuntarily, Defendant does argue that his <u>Miranda</u> waiver was ultimately invalid, and therefore, the Court, in an abundance of caution, will address the voluntariness of said waiver.

pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a Court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a Court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

In the present case, Defendant does not point to any particular factor which renders involuntary his November 23, 2019, rights waiver pursuant to Miranda. Defendant offers no specific argument that TFO Arguedas engaged in any specific coercive tactics that caused Defendant's will to be overborne during the interview.[16]

---

[16] Instead, Defendant asserts that based on TFO Arguedas' testimony at the October 20, 2020, Motions Hearing a video recording of the Defendant signing the Advice of Rights form exists but has not yet been produced, and therefore, "[t]he absence of the Douglas County Jail recording runs the government afoul [of] the best evidence

In fact, the Court's independent review of the provided audio recording of the November 23, 2019, interview indicates that the officers did not engage in any coercive tactics nor make any threats or promises to Defendant. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). Further, the Court's review of the provided audio recording of the interview with TFO Arguedas shows that Defendant spoke willingly and non-defensively with the officers, understood what was being asked of him, and responded appropriately to the question presented. Moreover, the interview which lasted approximately fifty-seven minutes was also not coercive in its duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding six-hour interview did not render confession involuntary).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights on November 23, 2019, was voluntary.

---

doctrine." (Def.'s Mem., [Docket No. 70], at 14). Based on that argument, Defendant concludes that "[w]ithout the recording the government cannot meet its burden of demonstrating the knowing, voluntary and intelligent nature of [Defendant's] waiver." (Id. at 16). The Court finds this argument to be unpersuasive. Courts in this District have repeatedly held that "federal constitutional law does not require" recording of "statements made by suspects subject to custodial interrogation" or a defendant's waiver of his Miranda rights. See, e.g., United States v. Liu, No. 8-cv-15 (ADM/FLN), 2008 WL 1994977, at *16 (D. Minn. Apr. 7, 2008). Moreover, Defendant's entire argument here is predicated on the incorrect factual assumption that "[n]o doubt, the video exists." (Def.'s Mem., [Docket No. 70], at 14). Although in his testimony at the October 20, 2020, Motions Hearing TFO Arguedas affirmatively acknowledged that the Douglas County jail's surveillance video "recorded" Defendant signing the Advice of Rights form, TFO Arguedas also testified that he was "not sure" if it was audio recorded or video recorded or both. (Tr. 68–69). TFO Arguedas further testified that he had not yet obtained the recording from Douglas County jail, and he was unaware of the status of the recording. (Tr. 68–69). In fact, the record now before the Court demonstrates that at the time of the October 20, 2020, Motions Hearing, the "camera footage" of Defendant's signing of the Advice of Right form no longer existed. On October 27, 2020, in response to TFO Arguedas' request, the Jail Administrator for the Douglas County Jail responded that the "camera footage" for November 2019, no longer exists. She explained that the camera system does not have the capability of going back further than sixty days.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the November 23, 2019, interview consists of the audio recording of the interview, the Motions Hearing testimony of TFO Arguedas, and the Advice of Rights form signed by Defendant.

Defendant fails to point to any particular evidence which he argues demonstrates that his waiver was not knowingly and intelligently made. In fact, Defendant fails to offer any specific argument that his waiver was not knowingly and intelligently made.

The Court finds that on the present record, the Government offers sufficient evidence related to the November 23, 2019, recorded interview of Defendant by TFO Arguedas for the Court to determine that Defendant's waiver of his rights prior to that interview was knowing and intelligent.

On the record now before the Court, considering the totality of the circumstances, during the November 23, 2019, recorded interview by TFO Arguedas, Defendant fully comprehended the nature and scope of the conversation during the November 23, 2019, interview; understood the circumstances of the situation; understood the questions being asked of him; and provided contextually appropriate answers to questions presented. Defendant's coherency, understanding, and comprehension of the situation were demonstrated in Defendant's responses to TFO Arguedas' inquires in which Defendant corrected factual statements made by TFO Arguedas. Defendant's demeanor during the interview remained responsive and cooperative until Defendant decided to stop talking with TFO Arguedas.

Moreover, after TFO Arguedas read aloud to Defendant a recitation of his Miranda rights, Defendant signed the Advice of Rights waiver form before TFO Arguedas began actually

interviewing Defendant. The signing of such a form "carries a significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). TFO Arguedas specifically testified that he read aloud the Advice of Rights form to Defendant. The weight to be given to Defendant signing this Advice of Rights form is bolstered by the fact that TFO Arguedas read aloud the rights on the form to Defendant before handing him the form.

Even if Defendant had not signed the form, his actions—of answering questions cooperatively—after specifically being advised of his rights and being given time to review the form imply that he understood his rights and he waived those rights. See, Butler, 441 U.S. 369 (holding that a waiver of rights pursuant to Miranda need not be explicit but may be inferred from the actions and words of a person being interrogated and such a waiver "is usually strong proof of the validity of that waiver"). Moreover, nothing in the record now before the Court indicates that Defendant was coerced into signing the Advice of Rights form.

Therefore, under the totality of the circumstances—including the consideration of Defendant's own actions and words—the Court concludes that Defendant's waiver of his rights prior to the interview by TFO Arguedas on November 23, 2019, was both knowing and intelligent.

Therefore, to the extent Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 42], seeks an Order of this Court suppressing Defendant's statements made during the November 23, 2019, interview by TFO Arguedas, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 42], be **DENIED**.

## IV.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT**:

1.   Defendant's Motion to Suppress Evidence, [Docket No. 41], be **DENIED**; and

2.   Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 42], be **DENIED**.

Dated: January 7, 2021                                        s/Leo I. Brisbois
                                                              Hon. Leo I. Brisbois
                                                              U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.